

I N T H E

# Indiana Supreme Court

Supreme Court Case No. 24S-CR-147

## Antonio Turner,
*Appellant (Defendant below),*



FILED

Mar 12 2025, 10:27 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

—v—

## State of Indiana,
*Appellee (Plaintiff below).*

Argued: June 20, 2024 | Decided: March 12, 2025

Appeal from the Marion Superior Court
No. 49D32-2110-F5-31008
The Honorable Andrew Borland, Magistrate Judge

On Petition to Transfer from the Indiana Court of Appeals
No. 23A-CR-1868

**Opinion by Justice Molter**

Chief Justice Rush and Justices Massa and Slaughter concur.
Justice Goff concurs in the judgment with separate opinion.

**Molter, Justice.**

This is a case about a good guy with a gun shooting a bad guy with a gun when the only choices were to shoot or be shot.

Antonio Turner was one of three students studying organic chemistry at a classmate's home, tucked away in a quiet neighborhood just outside of Indianapolis. While they were studying, the classmate's jealous love interest, Dequan Briscoe, repeatedly called her. And when he learned Turner was at her home, Briscoe twice threatened to "pull up" on Turner—to attack him—which Turner heard over the speakerphone. Shortly after hearing the threat, Turner walked outside to his car, and moments later, he sensed that the unfamiliar car screeching towards him down the sleepy street was an ambush. Since he didn't have time to reach the house and had nowhere to hide, he turned while running and fired four shots into the car, wounding Briscoe. Turner fired based on his intuition—he didn't recognize the car, couldn't see through its darkly tinted windows, and wouldn't have recognized Briscoe if he saw him. But that intuition proved prescient. It turns out Briscoe was aiming a handgun to shoot Turner just before Turner began firing.

Because Turner shot Briscoe before Briscoe shot Turner, Turner is the defendant rather than the victim in this case; the State charged Turner with battery by means of a deadly weapon, a Level 5 felony. And following a bench trial, the magistrate judge convicted him. Yet the judge agreed with Turner that, in hindsight, it was necessary for Turner to fire at Briscoe to avoid being shot. But the judge rejected Turner's self-defense justification because, without the benefit of hindsight, it was objectively unreasonable for Turner to fire at a car into which he couldn't see. Turner made the best choice, the judge explained, and it was unfortunate that his only choices were a felony or funeral. But that paradox followed from the objective reasonableness standard governing Indiana's self-defense law, and the law gave the judge no choice but to convict, he believed.

Fortunately for Turner, that isn't how Indiana's self-defense law functions. To be sure, the judge was correct that the self-defense statute justifies using force when the defendant's actions are objectively reasonable in the circumstances. And many cases explain we don't use

hindsight to *second-guess* the reasonableness of the defendant's decisions in the heat of the moment.

But this case presents a question of first impression in Indiana: Do we deprive defendants of the *benefit* of hindsight when it reveals their conduct was necessary in self-defense, even though that necessity wasn't fully apparent in the moment? The answer is that we do not, and we base that answer on a sentence in the self-defense statute that our Indiana appellate courts have never interpreted before, which says: "No person, employer, or estate of a person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting the person or a third person by reasonable means necessary." Ind. Code § 35-41-3-2.

Because the trial court concluded that Turner's conduct was necessary in self-defense, the statute justified the shooting, and we vacate the conviction.

# Facts and Procedural History

## I.   Factual Background

The State, Turner, and the trial court all agree that Turner is an upstanding citizen whose involvement here results from terrible luck leading him to the wrong place at the wrong time. Before this case, he had no criminal history, and as the trial court described: "he has led a law-abiding life," and he "has shown himself to be a productive, employed, respected member of the community." Tr. at 140.

Turner grew up on the east side of Indianapolis and graduated from Warren Central High School, participating in band throughout his high school years. Among his bandmates and their parents, he earned a reputation as honest and peaceful. Then, after graduating from Warren Central, he attended Indiana University-Purdue University Indianapolis, pursuing a double major in biology and medical humanities. Alongside his collegiate studies, he also worked for Kroger processing e-commerce, and he worked for a dog training business.

Through a cruel twist of fate, the tragedy here stems from Turner's commendable enrollment in organic chemistry his senior year in college. It was a difficult course, so he would often study with a classmate, Nyah Grice. Their last study session together was in preparation for an upcoming Monday exam, and they met around 5:00 p.m. on a Saturday at her home in a quiet Lawrence, Indiana, neighborhood just outside Indianapolis. Another student, Maray Bell, joined them a little while later.

Grice had been in a relationship with Dequan Briscoe, and it is unclear whether they were still dating at that time. But over the course of the evening, Briscoe called and texted Grice repeatedly, and Turner heard several of those phone conversations over Grice's speakerphone. Grice told Briscoe not to come to her house because she was studying, which angered Briscoe, and he began questioning why Turner was in her house. Eventually, Briscoe repeatedly told Grice that he was going to "pull up" on Turner, which Turner heard. *Id.* at 89, 90. Turner interpreted the statement as common lingo on the east side of Indianapolis meaning Briscoe was "coming to harm [him] in some way." *Id.* at 90.

Now concerned for his safety, Turner went outside to retrieve his handgun from his car around 8:30 p.m. He was licensed to carry his firearm, which his mother had given him for protection because they lived together in a "very dangerous" part of Indianapolis where he had seen many people shot. *Id.* at 84.

As he was walking to his car, he noticed another car's headlights from "about five houses down." *Id.* at 91. But it wasn't moving, so he thought nothing of it and continued to the passenger side of his car to retrieve his handgun. Turner then began walking back toward Grice's house. While he was ascending her driveway, the other car's engine revved, and the car sped down the street towards him, tires squealing. Turner had never met Briscoe before, didn't know what he looked like, and didn't know what kind of car Briscoe drove, but he was aware from Grice that Briscoe regularly carried a gun, and he "just knew" that the car barreling toward him was Briscoe. *Id.*

Turner tried to run to the house but couldn't get there before the car abruptly stopped in front of the driveway. The car—a Volkswagen Jetta—

had dark, illegally-tinted windows, so Turner could not see inside. But he sensed he was about to be attacked, so he turned around and fired four shots at the car, stopping when it drove off. Two of Turner's shots hit Briscoe, one in each arm. And it turns out that Turner's intuition was correct: Briscoe was driving the Jetta, armed with a handgun, and aiming to shoot Turner.

After he was shot, Briscoe fled and pulled his car into a nearby open garage. Authorities arrived shortly after and treated his wounds. They also discovered Briscoe's blood-stained, unholstered gun resting in the passenger seat of his vehicle. Meanwhile, Turner gathered his things at Grice's house and went home. After Turner learned from Grice that his shots wounded Briscoe, he called the police and told them what happened.

## II.   Procedural History

The State charged Turner with Level 5 felony battery by means of a deadly weapon. He waived his right to a jury trial, so the magistrate judge conducted a bench trial, at which Turner claimed the shooting was justified by self-defense.

Briscoe and Turner both testified, and they gave conflicting accounts. Turner's account tracks our factual description above. Briscoe, on the other hand, claimed that while he had told police he was upset that Turner was at Grice's home, he really wasn't, although he was "a little upset" that Grice told him not to come over. Tr. at 20. He acknowledged that he stopped his car in the middle of the street in front of Grice's house, but he said he didn't speed up and he didn't pull out his handgun. He testified that it may have seemed like he was driving fast, even though he wasn't, because he had modified his car so that it would have a "loud exhaust on it." *Id.* at 9, 22. He had also tinted his windows darker than the legal limit.

He testified that when he stopped in front of the house, he saw someone in the driveway who he assumed was Turner and who "just turned around and started shooting." *Id.* at 12. And after he was shot in

both arms, he sped away. As for the blood-stained handgun police found on his passenger seat pointed towards the passenger window, he gave conflicting accounts of whether the gun simply fell out of its holster in the console or whether he unholstered the gun while driving away.

After hearing all the evidence, the judge explained he agreed with Turner about "what are the facts." *Id*. at 125. Briscoe was "upset apparently because Mr. Turner [was] there with his girlfriend or ex-girlfriend," and Briscoe said he was going to "pull up" on Turner. *Id.* The judge agreed with Turner that Briscoe's statements over the phone were "threats that Mr. Turner heard." *Id*. at 126. He also reiterated he "believe[d]" Turner's testimony, and Turner was "being truthful" when he spoke with police and in court, and the judge credited the witnesses who testified to Turner's "reputation [] of being a truthful person." *Id*. As for the gun in Briscoe's car, the judge concluded that "Briscoe lied . . . about how that gun got out in the seat," and he was "lying about it falling out of the holster," as "holsters are designed so that guns can't fall out of them." *Id*. Instead, the judge concluded that Briscoe "did likely draw his gun inside of that car and probably had bad intent" to shoot Turner. *Id*.

Yet, the judge rejected Turner's self-defense claim and convicted him. He agreed with Turner that "this is a good guy in a bad guy scenario." *Id*. at 127. And he empathized that he couldn't say he "might not have done the same thing," *id*., because "what the heck else [was Turner] supposed to do?" *Id*. at 141. But he understood the law as constraining him to convict because Turner "couldn't see inside of this car" and "couldn't see a gun," so Turner's fear that he was about to be shot, while accurate, was unreasonable as a matter of self-defense law. *Id*. at 126–27. As the judge understood the law, Turner could only be justified in shooting if either "he saw the gun and it was being raised toward him, or [he] knew that Briscoe was the guy, or that the car was about to run him right over in order for that combination of the fear created by the threats on the phone and the circumstances he saw to justify the self-defense." *Id*. at 127. The judge concluded by lamenting the burdens that would come with Turner's felon status, but assuring Turner: "honestly, if your choice was between being a convicted felon and being harmed, you probably made the right choice." *Id*. at 142.

Turner appealed his conviction, arguing that the "trial court misinterpreted and misapplied Indiana's self-defense statute." Appellant's Br. at 12. The court's mistake, Turner argued, was concluding that "it had no choice under Indiana law but to convict Turner although the trial court made it clear that if Turner had not taken the actions that led to his conviction, Turner's life would have been in real jeopardy." *Id.* The judge had agreed with Turner about what the evidence showed, so Turner made clear he was not asking the appellate courts "to reweigh the evidence nor assess the credibility of the witnesses." *Id.*

The State argued in response that "Turner's argument fails because he asks [the court] to determine the reasonableness of his actions in hindsight instead of determining the reasonableness of his actions based on the circumstances surrounding his conduct when he used force." Appellee's Br. at 6. The Court of Appeals agreed with the State, affirming in a unanimous nonprecedential memorandum decision. *Turner v. State*, No. 23A-CR-1868 (Ind. Ct. App. Dec. 27, 2023) (mem.). It based its decision on Turner's testimony "that he had never previously met Briscoe or seen his car, he did not know who was driving the car, he did not see a gun pointed at him, and Briscoe never shot at him." *Id.*

Turner then petitioned for transfer to our Court, which we granted, thus vacating the Court of Appeals decision. Ind. Appellate Rule 58(A).

## Standard of Review

Turner challenges his conviction on the basis that the trial court mistakenly rejected his self-defense justification. As with any statute, we review the trial court's interpretation of the self-defense statute de novo. *Fix v. State*, 186 N.E.3d 1134, 1138 (Ind. 2022). And "[w]hen a defendant challenges the State's sufficiency of the evidence to rebut a claim of self-defense, the standard of review remains the same as for any sufficiency of the evidence claim." *Miller v. State*, 720 N.E.2d 696, 699 (Ind. 1999). "[W]e do not reweigh evidence or assess witness credibility, and only look to the evidence most favorable to the judgment." *Larkin v. State*, 173 N.E.3d 662, 667 (Ind. 2021) (quotations omitted). We will affirm the defendant's

conviction if there is evidence, including reasonable inferences, that supports the judgment. *Id.* And we will reverse the defendant's conviction "only if no reasonable person could say that" the defendant's self-defense claim "was negated by the State beyond a reasonable doubt." *Wilson v. State*, 770 N.E.2d 799, 801 (Ind. 2002).

# Discussion and Decision

At this point in the case, there is no longer any dispute between the parties about the material facts: Turner avoided being shot by Briscoe only by shooting Briscoe first, but Turner fired based on intuition, unable to see through Briscoe's darkly tinted windows. The magistrate judge reasoned that while it was *necessary* for Turner to shoot Briscoe in self-defense, it was not *reasonable,* because the necessity was only apparent in hindsight. The State agrees that was the appropriate analysis, and Turner's argument on appeal is that the trial court's reasoning reflects a legal error—the judge misinterpreted the self-defense statute.

We agree with Turner. Under Indiana's self-defense statute, justification for using force based on a *mistaken* belief about necessity depends on the reasonableness of the belief given the circumstances. But using defensive force based on an *accurate* belief is justified regardless of the belief's reasonableness. In other words, using force for protection based on a belief that is both unreasonable and turns out to be wrong isn't justified, but acting on a belief that is unreasonable, yet right, is justified.

Below, we discuss how Indiana's self-defense justification bars conviction for what would otherwise be criminal conduct. Then, we explain how resort to hindsight differs depending on whether it is used to second-guess the reasonableness of the defendant's fear or instead to confirm the necessity of defensive force. Finally, we note that this analysis does not reflect a change in Indiana's self-defense law but rather how the self-defense statute applies to a sliver of circumstances where the necessity of self-defense is only fully apparent in hindsight.

# I. Self-defense justifies what would otherwise be criminal conduct.

Self-defense is a legal justification for what would otherwise be criminal conduct, *Larkin v. State*, 173 N.E.3d 662, 670 (Ind. 2021), and it operates as a complete bar to conviction, *Hill v. State*, 497 N.E.2d 1061, 1064 (Ind. 1986). Once the defendant invokes self-defense, the State has the burden to disprove beyond a reasonable doubt at least one element of the justification. *Id.*

Our legislature recognizes that the "citizens of this state have always enjoyed" "robust self-defense rights." I.C. § 35-41-3-2(a). And we recently recognized that Article 1, Section 1's guarantee of an "inalienable" right to "life" includes the right of self-defense, which "was a firmly established right long before Indiana became a state." *Members of Med. Licensing Bd. of Indiana v. Planned Parenthood Great Nw., Hawai'i, Alaska, Indiana, Kentucky, Inc.*, 211 N.E.3d 957, 976 (Ind. 2023); *see generally* 1 Jens D. Ohlin, *Wharton's Criminal Law* § 14:2 (16th ed. 2024) (explaining the common law origins of the self-defense justification). Our Indiana Constitution also protects that right through the means Turner used here: "The people shall have a right to bear arms, for the defense of themselves and the State." Ind. Const. art. 1, § 32; *see also Kellogg v. City of Gary*, 562 N.E.2d 685, 694 (Ind. 1990) (explaining that it is "clear that our constitution provides our citizenry the right to bear arms for their self-defense" (quotations omitted)).

These rights may be regulated, though, *Matthews v. State*, 148 N.E.2d 334, 338 (Ind. 1958), and the legislature regulates self-defense through Indiana Code section 35-41-3-2. *See* I.C. § 35-41-3-2(a) (explaining that the purpose of the self-defense statute "is to provide the citizens of this state with a lawful means of carrying out" the state's policy "that people have a right to defend themselves and third parties from physical harm and crime"). Every state recognizes a self-defense justification, *see* Shlomit Wallerstein, Essay, *Justifying the Right to Self-Defense: A Theory of Forced Consequences*, 91 Va. L. Rev. 999, 999 (2005) (noting that "the right to self-defense is recognized in all jurisdictions"), and Indiana's statute reflects the common features, *see* 2 Paul H. Robinson, *Crim. L. Def.* § 121 (2024) (describing the features common to all self-defense statutes).

The statutory trigger is generally "the imminent use of unlawful force." I.C. § 35-41-3-2(c). A defendant generally may use force only when necessary for protection. *Id.*; *see also Hileman v. State*, 224 N.E.3d 321, 328 (Ind. Ct. App. 2023) (explaining that the right to self-defense ends when the danger passes). And the force must be proportional to the threat. I.C. § 35-41-3-2(c) (providing that only "reasonable force" may be used in defense); *Hall v. State*, 231 N.E.3d 868, 874–75 (Ind. Ct. App. 2024) ("The amount of force that an individual may use to protect himself must be proportionate to the urgency of the situation."), trans. denied.

Of course, we evaluate all of this in hindsight. And when people make split-second decisions about how to defend themselves in what they perceive to be a dangerous situation, they sometimes make mistakes that become apparent only with the benefit of that hindsight. Or, on the other hand, the necessity of their actions may become fully apparent only through hindsight. How we use hindsight to determine whether self-defense justifies force depends on whether hindsight reveals a mistake or confirms the necessity of using force.

## II.   A defendant's use of force based on what turns out to be a mistaken belief about the necessity is only justified if the mistake was a reasonable one.

"Every jurisdiction recognizes some defense for some mistakes as to a justification," and most do that "by including the word 'believes' in the definition of a justification." 2 Paul H. Robinson, *Crim. L. Def.* § 184 (2024). Our legislature has taken that approach, building grace for mistakes into the self-defense statute so long as the person acts reasonably under the circumstances. Specifically, our self-defense statute says:

> A person is justified in using reasonable force against any other person to protect the person or a third person from what the person **reasonably believes** to be the imminent use of unlawful force. However, a person:

(1) is justified in using deadly force; and

(2) does not have a duty to retreat;

if the person **reasonably believes** that that force is necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony.

I.C. § 35-41-3-2(c) (emphases added).

Our Court has determined that the above language establishes both a subjective and an objective standard to evaluate the reasonableness of a defendant's belief that force was necessary to protect against the imminent use of unlawful force. *Littler v. State*, 871 N.E.2d 276, 279 (Ind. 2007). Subjectively, the defendant must actually believe force is necessary, and objectively, that belief must be one that a reasonable person would form given the circumstances. *Id.*

Under this part of the statute, we evaluate the reasonableness of the defendant's belief only *prospectively*. "The law protects persons who feel compelled to act at such times even though in retrospect it is proved they have erred." *Heglin v. State*, 140 N.E.2d 98, 99 (Ind. 1957); *id.* ("The law does not use hindsight as a measure of reasonable conduct under circumstances such as these."). "The question of the existence of such danger, the necessity . . . as well as the amount of force necessary to employ to resist [an] attack can only be determined from the standpoint of the defendant at the time and under all the then existing circumstances." *French v. State*, 403 N.E.2d 821, 824 (Ind. 1980). That means that "the trier of fact must consider the circumstances as they appeared to the defendant, rather than to the victim or anyone else." *Washington v. State*, 997 N.E.2d 342, 350 (Ind. 2013). Even though the defendant's testimony is "critically relevant," the reasonableness of the defendant's belief remains a strictly objective inquiry. *Id.* at 349.

So, for example, under the self-defense statute, a person is justified in using force to defend against someone pointing an unloaded gun if the person in fear reasonably believes the gun is loaded. A cashier confronting

an armed robber reasonably fears the gun is loaded. An actor filming a scripted shooting scene doesn't. Thus, an actor mistakenly shooting in self-defense wouldn't be justified, but a cashier shooting in self-defense would. That is so even though hindsight reveals the robber's gun was unloaded, because the cashier's belief was reasonable under the circumstances despite being mistaken.

Through this prism, the magistrate judge analyzed Turner's circumstances, asking whether—setting aside hindsight—it was reasonable for Turner to fear a car he didn't recognize, into which he couldn't see. And if that were the only question, we would affirm. Turner argues, and the concurring opinion agrees, that his conduct was objectively reasonable even viewed only prospectively because Briscoe had recently threatened him, Turner knew Briscoe carried a gun in his car, and a car was speeding aggressively towards Turner in a way consistent with an ambush.

But the question "is whether the inferences supporting the judgment were reasonable, not whether there were other more reasonable inferences that could have been made." *Thompson v. State*, 804 N.E.2d 1146, 1150 (Ind. 2004) (quotations omitted). As the State correctly points out, it was within the trial court's discretion to conclude that it is generally unreasonable for someone in Turner's position to shoot into a car they can't see inside and without knowing who is inside. So, for example, if Turner had been mistaken, and Briscoe hadn't been preparing to shoot him, we would have to affirm because there is evidence to support (even if it does not compel) the trial court's conclusion that Turner's fear that the approaching car posed an imminent threat was objectively unreasonable.

Another question, though—and this is a matter of first impression in Indiana—is whether the factfinder should ignore hindsight when it *confirms* rather than *belies* the defendant's belief. We address that question next.

## III. A defendant's use of protective force based on an accurate belief that force is necessary is justified even if the necessity is only fully apparent in hindsight.

### A. Statutory Interpretation

Indiana cases have focused on the first two sentences of the self-defense statutory provision quoted above, which provide that a defendant's use of force is justified when they have a reasonable belief that it is necessary to respond to a threat of unlawful force. I.C. § 35-41-3-2(c). But there is a third sentence—the final sentence in that provision—which no court has interpreted in a reported decision. That sentence says: "No person, employer, or estate of a person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting the person or a third person by reasonable means necessary." *Id.*

When we interpret statutes, we give the words their plain meaning, considering the statutory structure as a whole and avoiding interpretations that render any part of the statute meaningless or superfluous. *ESPN, Inc. v. Univ. of Notre Dame Police Dep't,* 62 N.E.3d 1192, 1195, 1199 (Ind. 2016). None of the words in this provision are ambiguous, and their meaning is so plain that there is no need to walk through their dictionary definitions. Read together, they simply codify the core self-defense justification for individuals recognized at common law, and they extend that protection to those (employers and estates) who face derivative liability for an individual's justified use of force. *See Page v. State,* 40 N.E. 745, 745 (1895) ("One who is without fault, and in a place where he has a right to be, and is there unlawfully assailed, may, without retreating, repel force with force, and go even to the extent of taking the life of his adversary, if in repelling his assailant he used no more force than is reasonably necessary in his own self-defense."). That is, at a minimum, a person is justified in using force when: (1) they are protecting themselves or someone else; (2) that protection is from an imminent threat (imminence is part of what makes the force "necessary"); (3) force rather

than some other means is "necessary" for that protection; and (4) their response is proportional (the "reasonable means necessary" for protection). I.C. § 35-41-3-2(c).

This final sentence in the self-defense statute also reflects both a subjective and an objective standard. Subjectively, the defendant's use of force must be for the appropriate purpose: to "protect[] the person or a third person." I.C. § 35-41-3-2(c). Objectively, the force must be a necessary, proportional response to an imminent threat. But the only mention of reasonableness in this sentence refers to the means used, not the defendant's belief. So for the core self-defense this sentence codifies, the justification depends on the *accuracy* of the defendant's belief, not its *reasonableness*.

In other words, the factfinder must determine, in *retrospect*, whether the use of force was really necessary. If so, self-defense justifies the conduct, no matter how reasonable or unreasonable the defendant's fear. But if not, the defendant must look elsewhere for justification because this sentence in the statute provides no refuge for mistaken beliefs.

Reading all three sentences of the relevant statutory provision together yields an understanding that boils down to what we explained long ago, which is that self-defense justifies the use of force when "the defendant acted without fault, was in a place where he had a legal right to be, and was in real danger of death or great bodily harm *or* was in such apparent danger as caused him in good faith to fear death or bodily injury." *Spinks v. State*, 437 N.E.2d 963, 965 (Ind. 1982) (emphasis added), *disapproved of in part on other grounds by McCraney v. State*, 447 N.E.2d 589, 591 (Ind. 1983) (clarifying that it is the State's burden to disprove self-defense). In short, the core self-defense justification applies when the force was necessary as discussed above in Section I, and then beyond that, there is statutory grace for mistakes, but only reasonable ones, as discussed in Section II. We use hindsight to confirm the necessity of using defensive force, but not to second-guess the reasonableness of any mistake.

As this analysis reflects, we are interpreting each of the three relevant sentences and explaining how they operate together, not, as the

concurring opinion describes, reading one clause "in isolation." *Post*, at 2, 3.

## B. Subjective Motivation

Our interpretation also does not, as the concurring opinion concludes, conflict with *Trogdon v. State*, 32 N.E. 725 (Ind. 1892). In *Trogdon*, the Court recognized the same subjective standard we recognize today: the defendant must be motivated to "protect himself from threatened danger." *Id.* We said there—as we're saying here—that "[t]he danger may be actual or only apparent." *Id.* And we said there—as we continue to agree here—a defendant "who does not in fact apprehend any danger" may not "*deliberately and maliciously kill another*, and successfully interpose the defense of self-defense[] because it subsequently appears that there was actual danger." *Id.* (emphasis added).

The commentators the concurring opinion cites, *post*, at 4, read *Trogdon* as we do, which is to confirm that the defendant's subjective motivation must be for protection, not some other malicious intent. For example, Professor Robinson's treatise describes the takeaway from *Trogdon* and cases like it as this:

> If *A* kills his enemy *B* for revenge, and he later learns to his happy surprise that by killing *B* he has saved the lives of *C* and *D*, *A* has no defense to murder. In other words, he must believe that his conduct is necessary to avoid the greater harm.

2 Paul H. Robinson, *Crim. L. Def.* § 122 n.4 (2024) (cited in the concurring opinion, *post*, at 4). Similarly, the Restatement of Torts points to *Trogdon* as the basis for this illustration:

> A points what appears to be a cane at B and addresses a gross insult to him. B to avenge the insult knocks A down. B is not privileged to do so, although the supposed cane is a disguised shotgun and A was attempting to shoot B and would have done so, had B not knocked him down.

Restatement (Second) of Torts § 63 cmt. f (Am. L. Inst. 1965). And Professor Simons—citing *Trogdon* and tracking our analysis—explains: the "unwittingly justified actor *who does not act for a defensive purpose* is probably not entitled to invoke self-defense," but "[o]n the other hand, if the actor does act for a defensive purpose, he might retain the right of self-defense even if his beliefs that the facts support defensive force are unreasonable, *so long as those beliefs turn out to be correct*." Kenneth W. Simons, *Self-Defense, Necessity, and the Duty to Compensate, in Law and Morality*, 55 San Diego L. Rev. 357, 360 (2018) (emphases added).

As *Trogdon* and these commentators recognize, the reason a defendant cannot interpose self-defense for a malicious killing is that a malicious killing is not for protection. Codifying that limitation, the statutory provision on which we rely for our holding says self-defense justifies only force "for protecting the person or a third person." I.C. § 35-41-3-2(c). That limitation is finely calibrated, though. While the State certainly has good reasons for not recognizing a justification for malicious killings, there would be serious constitutional questions if the law required an individual to succumb to being shot because their anticipation of being shot, while accurate, was nevertheless unreasonable. *See Members of Med. Licensing Bd. of Indiana v. Planned Parenthood Great Nw., Hawai'i, Alaska, Indiana, Kentucky, Inc.*, 211 N.E.3d 957, 976 (Ind. 2023) (recognizing that Article 1, Section 1 of the Indiana Constitution guarantees an "inalienable" right to "life" that includes the right of self-defense, which "was a firmly established right long before Indiana became a state"). And we generally prefer statutory interpretations that "avoid constitutional issues." *City of Vincennes v. Emmons*, 841 N.E.2d 155, 162 (Ind. 2006).

Having concluded that Indiana's self-defense statute justifies both (1) a defendant's use of proportional force necessary to protect the defendant or a third party, and (2) the same force based on a reasonable misapprehension about the need to use force, we turn to applying that understanding to the facts here.

### C.    Turner's Use of Force

Given the trial court's factual conclusions, to which we defer, Turner's actions were justified here. After considering all the evidence and weighing the witnesses' credibility, the trial court concluded that Turner was telling the truth, and his conduct was necessary to protect himself. Turner's choices, in the judge's view, were either to shoot or be shot, because Briscoe was lying when he testified, and he had drawn his gun to shoot Turner just before Turner shot him first.

The judge assured Turner that he navigated the horns of a dilemma as best Turner could, recognizing: "if your choice was between being a convicted felon and being harmed, you probably made the right choice." Tr. at 142. But as we explained in the previous section, Indiana law does not force that dilemma. Instead, based on the judge's factual determinations, Turner's shooting was justified under Indiana law because (1) he was protecting himself from a threat of serious bodily harm; (2) the threat was imminent; (3) the threat required force for protection; and (4) the force Turner used was proportional to the threat—he shot at Briscoe to avoid being shot and then stopped shooting when Briscoe drove off. Turner's use of force was justified not because his belief that he was about to be shot was *reasonable* but because that belief was *correct*, and force really was necessary to protect himself.

The concurring opinion finds two primary faults with this analysis, but each concern is misplaced.

First, the opinion characterizes our invocation of the self-defense statute's last clause as "*sua sponte*," *post*, at 1—which means "[w]ithout prompting or suggestion," *Sua Sponte*, Black's Law Dictionary (12th ed. 2024)—and the opinion reminds of the dangers of adopting "a theory without the exchange and vigorous testing of arguments by the parties in interest," *post*, at 5. While we agree those concerns warrant caution before invoking statutory provisions *sua sponte*, our reliance on that provision is not *sua sponte*.

It was Turner who invoked the statute and asked us to set aside his conviction based on it. His appellant's brief block-quoted the self-defense

statute and bolded the clause on which we rely: "No person, employer, or estate of a person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting the person or a third person by reasonable means necessary." Appellant's Br. at 15 (emphasis omitted) (quoting I.C. § 35-41-3-2(c)). He then argued he "had a lawful right to defend himself from serious bodily injury or death from the likes of Briscoe under the unique circumstances presented in this appeal." *Id.* at 20. And, he continued, "[i]n error, the trial court felt like it had no choice under Indiana law but to convict Turner although the trial court made it clear that if Turner had not taken the actions that led to his conviction, Turner's life would have been in real jeopardy." *Id.*

Turner persisted with this argument in his transfer petition, in which his argument section concisely summed up our analysis here: "As essentially found by the trial court, this was truly a case of 'shoot or be shot'. The trial court got the facts correct but applied the law under IC 35-41-3-2 incorrectly." Pet. to Trans. at 4. He repeated that argument in his conclusion. *Id.* at 11 ("The trial court got the facts correct but applied the law incorrectly. . . . This was truly a case of 'shoot or be shot' as found by the trial court."(emphases omitted)). Oral argument in our Court also included "vigorous testing of arguments by the parties in interest," *post*, at 5, as we questioned each side extensively about the analysis this opinion provides. *See* Oral Argument at 7:35–9:30, 19:40–21:00, 25:55–33:25.

Second, the concurring opinion says the record doesn't support a key premise of our analysis, which is that the magistrate judge concluded it was necessary for Turner to shoot at Briscoe to avoid being shot. *Post*, at 7. But even the State agreed at oral argument with Turner's characterization that the judge concluded Turner confronted a "shoot or be shot" predicament. Pet. to Trans. at 4, 11; Oral Argument at 19:40–20:21 (the State agreeing that the judge concluded that Briscoe was lying and was in fact pointing a gun at Turner). After all, the conclusion that Turner had to shoot Briscoe to avoid being shot is what led the judge to say Turner "probably made the right choice." Tr. at 142. Obviously, shooting Briscoe would not be the right choice if it wasn't necessary.

Because the magistrate judge agreed with Turner that his only choices were to shoot or be shot, we agree with Turner's argument that the self-defense statute justified his shooting.

## IV. All the limits our case law recognizes for the self-defense justification remain.

Our decision today is not a revision or expansion of Indiana's self-defense law. Rather, it reflects that an unusual fact pattern—the sort which is usually only the subject of academic hypothesizing—enlivens a typically dormant statutory provision. *See generally* 2 Paul H. Robinson, *Crim. L. Def.* § 122 (2024) ("But the question of whether the justified actor who acts without the requisite purpose or knowledge should be exculpated, is clearly independent of the question of whether the mistakenly unjustified actor should be."); *id.* (describing case law addressing facts like those here as "rare"). Still, the legislature's recognition of a robust self-defense justification remains tempered by important limits.

### A. The legislature recognizes a "robust" self-defense justification.

The State worries our interpretation of the self-defense statute will encourage a new Wild West, shoot first and ask questions later mentality. But of course it is the legislature rather than the courts setting the policy. And the legislature explained at the beginning of the self-defense statute that it was leaning into the "robust self-defense rights that citizens of this state have always enjoyed." I.C. § 35-41-3-2(a).

In any event, the State's own approach results in shooting first and asking questions later. What differs is who gets shot and what questions we're asking. If Turner behaved as the State says he should have, then Briscoe would have shot him first, and the courts would be analyzing the legal questions surrounding charges against Briscoe.

The State's concern also seems to reflect a misunderstanding of the role hindsight plays here. Turner's shooting was justified only because he was right; he really was about to be shot. But it would not be justified if it turned out he was wrong.

Suppose for example that the driver turned out to be an innocent food delivery driver who was in a hurry, a reckless teenager who enjoyed squealing their tires, or even an unarmed Briscoe who was just trying to startle Turner. Then the shooting wouldn't be justified under the statute. Shooting at the car wouldn't have been necessary for Turner to protect himself, so the core self-defense justification wouldn't apply. And we would have to defer to the trial court's evidence-based conclusion that the mistake wasn't reasonable, so the statutory grace for reasonable mistakes discussed in Section II wouldn't apply to justify the shooting either. *See, e.g.*, *Hall v. State*, 231 N.E.3d 868, 875 (Ind. Ct. App. 2024) (rejecting the self-defense justification where the defendant claimed he shot the victim to defend against the victim swinging a knife, "but no knife was found at the scene," and the jury concluded the defendant did not reasonably fear a knife), trans. denied. By foreclosing any grace for even honest yet unreasonable mistakes, there is no incentive for reckless behavior.

### B. There are several important limits on the self-defense justification.

Our case law recognizes several other important limits on the self-defense justification that today's opinion does not change.

First, the self-defense justification still requires that the defendant "was in a place where he had a right to be" and "acted without fault." *Larkin v. State*, 173 N.E.3d 662, 670 (Ind. 2021). "A person who provokes, instigates, or participates willingly in the violence does not act without fault for the purposes of self-defense." *Richardson v. State*, 79 N.E.3d 958, 964 (Ind. Ct. App. 2017). For example, we've rejected the self-defense justification where the defendant claimed that he feared violent retribution that was provoked by his own "initial confrontation and violent epithet." *Henson v. State*, 786 N.E.2d 274, 278 (Ind. 2003). Here, Turner had a right to be at Grice's house, and he was fleeing rather than confronting Briscoe.

Second, a self-defense justification cannot be based on a mere verbal threat because "oftentimes combatants make threats of violence which are never carried out." *Id.* Relatedly, the feared harm must be imminent. Just a few months ago, we denied transfer in a case where the Court of Appeals affirmed a murder conviction over a self-defense claim. The victims had previously, and repeatedly, threatened to kill the defendant—including showing up to his workplace and pointing a gun at him—and then they showed up armed to a gas station where the defendant was a customer. *Harris v. State*, 239 N.E.3d 35 (Ind. Ct. App. 2024), trans. denied. Seconds after they entered the gas station, the defendant shot and killed them.

Neither the trial court nor appellate court doubted the sincerity of the defendant's subjective fear of the victims, but the courts concluded the defendant did not face an imminent threat, and it wasn't reasonable for him to fear violence was imminent. Like this case, appellate review required deference to the trial court's decision that the defendant's fear was not reasonable. But unlike this case—where the trial court concluded Briscoe was about to shoot Turner—the trial court in *Harris* concluded that shooting the victims was not necessary for the defendant to avoid an imminent threat of harm because the victims had not yet seen the defendant. *Id.*

Third, "[w]hen a defendant arms himself or herself with a weapon before an imminent threat exists in a premeditated strategy to retaliate for past violence (rather than to protect against the imminent use of unlawful force)," self-defense does not justify using force. *Henson*, 786 N.E.2d at 278. That is because "[w]hile the criminal code is willing to excuse the use of force in certain circumstances to protect against certain unlawful activity, it does not countenance and will not sanction premeditated retaliation for past violence." *Id.* Turner only armed himself because he correctly believed he was in danger, not in retaliation for any past disagreement.

Fourth, "[w]here a person has used more force than necessary to repel an attack the right to self-defense is extinguished, and the ultimate result is that the victim then becomes the perpetrator." *Weedman v. State*, 21 N.E.3d 873, 892 (Ind. Ct. App. 2014). Turner stopped shooting when Briscoe drove away, using no more force than necessary.

Our concurring colleague is "skeptical" that these limits remain after today's opinion, offering this hypothetical to illustrate why:

> Take, for example, a defendant who, while idling at a stop light, encounters his rival in an adjacent vehicle—a rival known to frequently carry a gun. If the rival lowers his window to lob threats of violence but fails to reveal a weapon, what's to stop our hypothetical defendant from responding by firing his own gun into the rival's car?

*Post*, at 5.

Ironically, this point is made in an opinion *concurring* in the judgment and agreeing that Turner's shooting was justified when he confronted the essential facts of the hypothetical. Briscoe is the "rival known to frequently carry a gun" who decided to "lob threats of violence but fail[ed] to reveal a weapon." *Id.* Turner then "respond[ed] by firing his own gun into the rival's car." *Id.*

So it is true, as the concurring opinion observes, that "with today's decision, the defendant"—both in Turner's case and in the hypothetical— "need neither observe an imminent threat of harm nor reasonably believe in the presence of such threat." *Post*, at 5. But that is true under the concurring opinion too, which also concludes Turner's shooting was justified even though our concurring colleague acknowledges Turner didn't know what Briscoe looked like, didn't know what kind of car Briscoe drove, couldn't see inside Briscoe's car, and never saw a gun.

The key difference between the two opinions is that the Court's opinion vacates the conviction only because Turner's fear proved accurate in hindsight—the magistrate judge concluded Turner had to shoot Briscoe to avoid being shot. Because the magistrate judge concluded that Turner's fear was unreasonable, we would not set aside the conviction if that fear proved unfounded. In contrast, the concurring opinion concludes that Turner's shooting would have been justified even if it was unnecessary; *even if it turned out that Turner mistakenly shot a completely innocent bystander*. That approach, which shows no deference to the trial court's

evaluation of reasonableness, would dramatically expand the self-defense justification and contract our appellate deference to trial court evidence weighing.

Still, there is important overlap between this opinion and the concurring opinion. The concurring opinion says that to "avoid" "creating uncertainty in the law" and "leading to potentially harmful consequences for Hoosiers," we should "adhere to the principle set forth in *Trogdon*—a principle endorsed by modern scholars of the criminal law." *Post*, at 7. That is, we must "stress[] that privilege of self-defense does not accrue until there is the appearance of danger, either real or imaginary," and "insist[] that a defendant must *actually* believe in the necessity for force," and "that he has no defense when he intentionally kills his enemy in complete ignorance of the fact that his enemy, when killed, was about to launch a deadly attack upon him." *Id.* (emphasis in original, quotations and citations omitted). We agree, and Turner's shooting was within these limits.

As both opinions reflect, the legislature's statutory protection for the "robust self-defense rights that citizens of this state have always enjoyed" has important limits. I.C. § 35-41-3-2(a). But none of those limits require martyrdom in service of reasonableness. So Turner didn't have to take a bullet as the most reasonable thing to do; the law permitted him to save his own life.

# Conclusion

For these reasons, we vacate Turner's conviction and sentence.

Rush, C.J., and Massa and Slaughter, JJ., concur.
Goff, J., concurs in the judgment with separate opinion.

ATTORNEY FOR APPELLANT
Bryan L. Cook
Attorney at Law
Carmel, Indiana

ATTORNEYS FOR APPELLEE
Theodore E. Rokita
Attorney General of Indiana

Caroline G. Templeton
Supervising Deputy Attorney General

Alexandria Sons
Deputy Attorney General
Indianapolis, Indiana

**Goff, J., concurring in the judgment.**

Should the merits of a self-defense claim depend on the defendant having acted with knowledge of the justifying circumstances, even if his conduct is objectively justified in hindsight? Facing this very question well over a century ago, this Court held that a defendant who acted out of no apparent necessity to preserve life or limb may not "interpose the defense of self-defense" simply because it "subsequently appears that there was actual danger, of which he was at the time ignorant." *Trogdon v. State*, 32 N.E. 725, 727 (Ind. 1892).

The Court today reaches the opposite conclusion, holding *sua sponte* that, under an obscure and otherwise dormant provision of our self-defense statute, "Turner's use of force was justified not because his belief that he was about to be shot was *reasonable* but because that belief was *correct*, and force really was necessary to protect himself." *Ante*, at 17. Defendants like Turner, the Court opines, enjoy "the *benefit* of hindsight" when the evidence "reveals their conduct was necessary in self-defense, even though that necessity wasn't fully apparent in the moment." *Id.* at 3.

In my view, the statutory provision on which the Court relies is less than clear. And its novel interpretation, I fear, will create uncertainty in the law, leading to potentially harmful consequences. What's more, even if I were to agree with the Court's interpretation, its holding rests on a flawed premise—there's simply nothing in the record to support the conclusion that "Turner avoided being shot by Briscoe only by shooting Briscoe first." *See ante*, at 8. For these reasons, and because I believe the Court's novel statutory interpretation is entirely unnecessary to give Turner relief, I concur only in the Court's judgment.

## I. The Court's decision lacks supporting authority, creates legal uncertainty, and rests on a false premise.

Under Indiana's self-defense statute, a "person is justified in using reasonable force against any other person to protect the person or a third

person" from what he or she "reasonably believes to be the imminent use of unlawful force." Ind. Code § 35-41-3-2(c). The statute further justifies the use of "deadly force" and imposes no duty to retreat if the person "reasonably believes" that such force is "necessary to prevent serious bodily injury to the person or a third person or the commission of a forcible felony." *Id.* Finally, the statute concludes by stating that "[n]o person, employer, or estate of a person in this state shall be placed in legal jeopardy of any kind whatsoever for protecting the person or a third person by reasonable means necessary." *Id.*

The Court's decision turns on this last sentence of the statute—the Legal Jeopardy Clause (or just Clause), as I refer to it.

## A. Well-settled principles of statutory interpretation undermine the Court's novel reading of the Clause.

According to the Court, the Legal Jeopardy Clause simply codifies the "core self-defense justification" for a person facing prosecution, and it extends that protection to those facing "derivative liability." *Ante*, at 13. With this much, I agree. But the Court doesn't stop there. Instead, it goes on to conclude that, because the only reference to reasonableness relates to the "means used" for protection, the Clause reflects an "objective standard," so justification for self-defense depends only on "the *accuracy* of the defendant's belief, not its *reasonableness*." *Id.* at 14.

I'm left unpersuaded.

To begin with, while the "words" of the Clause themselves may be unambiguous when read in isolation, *see id.* at 13, precedent instructs us to "avoid interpretations that depend on selective reading of individual words," especially when such interpretations "lead to irrational and disharmonizing results." *ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1195 (Ind. 2016) (citation omitted). Instead, we must consider "the structure of the statute as a whole." *Id.* (citation omitted). Applying this well-settled principle of statutory interpretation, the Clause's "core self-defense justification," in my view—and as the statute as a whole contemplates—turns on whether the person "reasonably believes" the

circumstances call for the use of force. *See* I.C. § 35-41-3-2(c). By focusing on the absence of this language in a single sentence of the statute, and by reading the Clause in isolation, the Court undermines the "statute's underlying policy and goals." *See Culver Cmty. Tchrs. Ass'n v. Ind. Educ. Emp. Rels. Bd.*, 174 N.E.3d 601, 605 (Ind. 2021). Reading the Clause with the rest of subsection (c), by contrast, shows the statute was intended to require reasonable belief, even when the justification is proven accurate in hindsight.

Second, the legislature clearly spelled out when using reasonable force or deadly force is "justified." *See* I.C. § 35-41-3-2(c). Critically, there's no similar language in the Clause itself—a contiguous provision under the same statutory subsection. *See id.* It seems evident, then, that, had the legislature intended to create an accurate-in-hindsight justification, "it could have easily done so with slight modification to the wording of the statute" or it could have structured the Clause as a separate subsection. *See Sullivan Corp. v. Rabco Enters., LLC*, 160 N.E.3d 1124, 1127 (Ind. Ct. App. 2020) (citation omitted); *see also* Paul H. Robinson, *The Unknowingly Justified Actor—Knowledge, Purpose, and Motive in Justifications*, 2 Crim. L. Def. § 122(f), at 28 (1984) (citing statutes with and without "belief" language and urging legislatures to clearly distinguish between the "excuse of an actor who is mistakenly unjustified and the justification of an actor who is unknowingly justified").

Finally, as noted above, this Court has held that a defendant who acted out of no apparent necessity to preserve life or limb may not "interpose the defense of self-defense" simply because it "subsequently appears that there was actual danger, of which he was at the time ignorant." *Trogdon*, 32 N.E. at 727. The legislature, of course, may enact statutes that modify or abrogate the common law. *State v. Rendleman*, 603 N.E.2d 1333, 1336 (Ind. 1992). But we presume the contrary "unless a statute declares otherwise in either express terms or by unmistakable implication." *WEOC, Inc. v. Niebauer*, 226 N.E.3d 771, 777 (Ind. 2024) (internal citation and quotation marks omitted). And, as I see it, nothing in the Clause meets this standard. Simply because the sole reference to reasonableness attaches to the "means" used by the defendant, it does not necessarily follow that the

justification for use of force depends only on "the *accuracy* of the defendant's belief" in hindsight. *See ante*, at 14.

The Court insists that its decision here aligns with *Trogdon* because there, like here, the Court concluded that a defendant cannot point to actual danger to justify his actions in hindsight when he "*deliberately and maliciously kill[s] another.*" *Id.* at 15. But the holding in *Trogdon* wasn't so limited, as multiple commentators have observed. *See* Charles A. Thompson, Commentary to Indiana Code § 35-41-3-2, at 173–74 (West 1978) (citing *Trogdon* for the general proposition that, absent a "reasonable belief to justify an assault in self-defense at its inception such assault may not be subsequently justified by a finding of actual danger which was unknown to the defendant at the time of the initial assault"); Note, *Justification for the Use of Force in the Criminal Law*, 13 Stan. L. Rev. 566, 591 & n.106 (1961) (citing *Trogdon* for the basic proposition that "the courts will not justify the use of force, even when necessary for the protection of the actor, if he was not aware of that necessity"); Robinson, *supra*, § 122(e), at 21, 22 n.18 (noting that *Trogdon* "is one of the few cases that can be cited to support [the] view" that a person may successfully raise a self-defense claim "only if they act with a justificatory intent" or with "knowledge of the justifying circumstances") (internal quotation marks omitted). And as the *Trogdon* Court itself made clear, the "law allows one who is himself without fault, and is in a place where he has the right to be, to protect himself from threatened danger," whether "actual or only apparent," and "to use for that purpose such force as may *at the time reasonably seem necessary, and no more.*" 32 N.E. at 727 (emphasis added).

## B. The Court's novel interpretation of the Clause creates uncertainty in the law and may lead to potentially harmful consequences.

The Court insists that its decision here is "not a revision or expansion of Indiana's self-defense law." *Ante,* at 19. But, as I see it, that's precisely what the Court's decision accomplishes. The Court itself acknowledges that, before today, "no court has interpreted" the Legal Jeopardy Clause "in a reported decision." *Id.* at 13. And were it not for its novel reading of

this Clause, the Court "would have to affirm" the trial court's decision under our deferential standard of review. *Id.* at 12. In other words, the Court's interpretation of otherwise dormant language under our self-defense statute creates a novel approach to analyzing self-defense claims that may lead to a different outcome (like here) depending on the fact pattern of a case.

To be sure, we're often called upon to interpret or reinterpret our statutes in novel ways, ultimately building upon our jurisprudence in a given area of the law. *See, e.g.*, *Fix v. State*, 186 N.E.3d 1134, 1139 (Ind. 2022) (interpreting our burglary statute to conclude, as a matter of first impression, that the offense is an "ongoing" one "that encompasses a defendant's conduct so long as he remains in the premises"); *Ladra v. State*, 177 N.E.3d 412, 418 (Ind. 2021) (reinterpreting a provision of the Indiana Tort Claims Act to avoid granting "blanket immunity to the state in every circumstance involving inclement weather"). But neither Turner nor the State advocated for a reading of the self-defense statute the Court now espouses. And we should be reluctant to adopt a theory without the exchange and vigorous testing of arguments by the parties in interest.

Absent such analytical safeguards, today's decision threatens to open a Pandora's Box of unintended—and potentially harmful—consequences. Still, the Court assures us otherwise, downplaying any concern that its interpretation of the statute "will encourage a new Wild West." *Ante*, at 19. I remain skeptical.

Take, for example, a defendant who, while idling at a stop light, encounters his rival in an adjacent vehicle—a rival known to frequently carry a gun. If the rival lowers his window to lob threats of violence but fails to reveal a weapon, what's to stop our hypothetical defendant from responding by firing his own gun into the rival's car? The Court submits that a self-defense justification cannot rest on a "mere verbal threat because 'oftentimes combatants make threats of violence which are never carried out.'" *Id.* at 21 (quoting *Henson v. State*, 786 N.E.2d 274, 278 (Ind. 2003)). But with today's decision, the defendant need neither observe an imminent threat of harm nor reasonably believe in the presence of such threat. Even if the rival never intended to carry out his verbal threats, the

shooting may still be justified if a gun were later discovered in the rival's car (at least one within the rival's reach). *See State v. Hendrix*, 244 S.E.2d 503, 508 (S.C. 1978) (Gregory, J., dissenting) (citing *Trogdon* for the proposition that the belief requirement "prevents a defendant from deliberately and maliciously killing his fellow man and then interposing the defense of self-defense because it subsequently appears there was actual danger"). Such an approach runs contrary to a "basic proposition" of our criminal law—that "control over criminal behavior can best be achieved by reference to the state of mind of the actor rather than the consequences of his act." Note, *supra*, at 591.

The Court points to other "important limits on the self-defense justification" in its effort to quell fears over its reading of the Clause. *Ante*, at 20. I'm still left unpersuaded. For example, the Court insists that the "right to self-defense is extinguished" when a person uses "more force than necessary to repel an attack." *Id.* at 21 (quoting *Weedman v. State*, 21 N.E.3d 873, 892 (Ind. Ct. App. 2014)). But if the necessity of the defendant's conduct "wasn't fully apparent in the moment," *see id.* at 3, how does he—or a court for that matter—determine whether the force used is in fact proportional to the threat?

Another limitation, the Court stresses, arises when a "defendant arms himself or herself with a weapon before an imminent threat exists in a premeditated strategy to retaliate for past violence (rather than to protect against the imminent use of unlawful force)." *Id.* at 21 (quoting *Henson*, 786 N.E.2d at 278). But if the "core self-defense" justification embodied in the Clause depends on "the *accuracy* of the defendant's belief, not its *reasonableness*," *see id.* at 14, then arguably "no subjective mental elements should play a part in the formulation of justification defenses," *see* Robinson, *supra*, § 122(f), at 27. If the result is justified (protection from an imminent threat of serious bodily harm), then why make *any* distinction between the unknowingly justified actor and the improperly motivated one? *See id.* (suggesting that "an objectively justified actor should have a justification defense no matter what knowledge, purpose, disregard, or ignorance he may have").

The Court's decision fails to address these issues, creating uncertainty in the law and leading to potentially harmful consequences for Hoosiers. To avoid such an outcome, I would adhere to the principle set forth in *Trogdon*—a principle endorsed by modern scholars of the criminal law. *See, e.g.,* Thompson, *supra*, at 174 (stressing that the "privilege of self-defense does not accrue until there is the appearance of danger, either real or imaginary"); Wayne R. LaFave, *Reasonable Belief in Necessity for Force*, 2 Substantive Crim. L. § 10.4(c), at 203–04 (3d ed. 2018) (insisting that a "defendant must *actually* believe in the necessity for force," adding that he "has no defense when he intentionally kills his enemy in complete ignorance of the fact that his enemy, when killed, was about to launch a deadly attack upon him").

## C. Even if the Court's interpretation were agreeable, its holding rests on a flawed premise.

Even if I were to agree that the Legal Jeopardy Clause justifies the actions of an unknowingly justified defendant, the Court's holding rests on a flawed premise—namely, that "Turner avoided being shot by Briscoe only by shooting Briscoe first." *See ante*, at 8. According to the Court, "Turner's use of force was justified not because his belief that he was about to be shot was *reasonable* but because that belief was *correct*, and force really was necessary to protect himself." *Id.* at 17. The Court reaches this conclusion based on the trial judge's purported determination that "Briscoe was lying when he testified, and he had *drawn his gun to shoot Turner* just before Turner shot him first." *Id.* (emphasis added). The Court echoes this point throughout its opinion, claiming that "Briscoe *was aiming a handgun to shoot* Turner just before Turner began firing." *Id.* at 2 (emphasis added); *see also id.* at 5 (insisting that Briscoe was "aiming to shoot Turner"); *id.* at 12 (suggesting that Briscoe had "been preparing to shoot" Turner).

The problem is the record doesn't support this conclusion. The *only* determination the trial court reached was that, given the fact that his gun was found unholstered in the passenger seat, Briscoe "likely dr[e]w his gun inside of that car and probably had bad intent." Tr. Vol. 2, p. 126. But

unholstering a gun with "bad intent" *is not the same* as "aiming a handgun to shoot" someone. And the trial court drew no inference to the contrary. For all we know, and for all the trial judge knew, Briscoe could have drawn his gun from the holster *not* with the goal of pulling the trigger but, rather, with the purpose of brandishing it to scare Turner into fleeing.

Still, the Court insists that "even the State agreed" the trial court "concluded Turner confronted a 'shoot or be shot' predicament." *Ante*, at 18 (citing Pet. to Trans. at 4, 11). But the State clarified its position at oral argument, expressly "disagree[ing]" with the proposition that the "judge found that Briscoe was pointing the gun at Turner." Though acknowledging the trial court had found that Briscoe "had drawn his gun," the State characterized as "pure speculation" the judge's "comment that he believed that [Briscoe] was pointing the gun." Oral Argument at 19:47–20:22.

Simply put, there is no basis in the record or reasonable inference from the evidence to support the Court's conclusion that "Turner avoided being shot by Briscoe only by shooting Briscoe first." *See ante*, at 8.

## II. Under the "reasonable belief" standard, the circumstances here justified Turner's actions.

Finally, the Court's novel interpretation of the statute, in my view, is entirely unnecessary to give Turner relief.

In a challenge to the sufficiency of the evidence to rebut a claim of self-defense, the standard of review is the same for any sufficiency-of-the-evidence claim: an appellate court neither reweighs the evidence nor judges the credibility of witnesses, leaving the verdict undisturbed if sufficient evidence of probative value supports the factfinder's conclusion. *Wilson v. State*, 770 N.E.2d 799, 801 (Ind. 2002). If the defendant stands convicted of the charged offense despite a claim of self-defense, reversal is warranted only if no reasonable person could say that self-defense was negated by the State beyond a reasonable doubt. *Id.* at 800–01.

Here, Turner isn't asking this Court to reweigh the evidence or assess the credibility of witnesses. Appellant's Br. at 12. He argues instead that the trial court, while making the proper findings of fact, misinterpreted and misapplied Indiana's self-defense statute. *Id.* The law, he contends, requires "only reasonable knowledge and belief that the use of self-defense is justified," not "perfect knowledge and belief." Pet. to Trans. at 4. And his fear of death or bodily harm was reasonable, he insists, given the "direct evidence of serious threats by Briscoe against Turner paired with **strong circumstantial evidence** that the erratically driven car was being driven by Briscoe to carry out his declared threats." Reply in Support of Trans. at 4.

I agree.

Indiana's self-defense statute establishes "both an objective and subjective standard" to evaluate the reasonableness of a defendant's belief that force was necessary to protect against the imminent use of unlawful force. *Littler v. State*, 871 N.E.2d 276, 279 (Ind. 2007) (internal citation omitted). Under the subjective standard, the defendant must have "actually believed" force was necessary. *Id.* And under the objective standard, the defendant's belief must be one that a "reasonable person" would form given the circumstances. *Id.*

Applying these standards, the circumstances here, in my view, clearly justify Turner's actions: he knew that Briscoe owned a gun; he overheard Briscoe make angry, profanity-laced remarks to Nyah (his study partner) over the phone; Briscoe threatened to "pull up on" Turner, which Turner understood to mean that he'd be "coming to harm" him; and, not long after that tense exchange, a vehicle sped up to Turner—its engine revving and tires squealing—just as Turner had walked away from his own car parked in the cul-de-sac of a suburban, residential neighborhood. Tr. Vol. 2, pp. 89–90.

Though Turner couldn't *definitively* say whether it was Briscoe in the car or whether Briscoe was pointing a gun at him, as the trial court stressed, the law didn't require him to. The touchstone of self-defense is

reasonable belief, *not absolute certainty*.[1] *See Brand v. State*, 766 N.E.2d 772, 781 (Ind. Ct. App. 2002) (citation omitted) (noting that a defendant's belief of "apparent danger" does not require that the danger be actual—only that the belief be in good faith). And Turner testified that, given the circumstances, he *believed* it "*had to be*" Briscoe "pulling up," that there was "*[no] way it wasn't.*" Tr. Vol. 2, pp. 91, 103 (emphases added). In short, Turner wasn't acting based on "threats alone," as the trial court found, but, rather, on the circumstances before him at the time, which he *reasonably believed* placed him in grave danger. *See Brown v. State*, 265 N.E.2d 699, 701 (Ind. 1971) (reasonableness of a defendant's actions must be analyzed based on what he knew "at the time").

To be sure, Turner stood in the driveway while Briscoe's car stopped on the street at the edge of the driveway. But that didn't necessarily remove Turner from imminent danger. To the contrary, the distance between them was relatively short, and the car could have easily accelerated and struck Turner or run him over. Indeed, Turner testified at trial that, just as he stepped onto the driveway, the car was "right on [his] heels," leading him to "believe" that if he "were to stop," the car "would keep going and hit [him]." Tr. Vol. 2, p. 91. What's more, given his knowledge that Briscoe owned a gun, and given his conviction that Briscoe occupied the car, Turner—in his mind—was faced with either acting to protect himself or waiting until Briscoe ran him over or drew his weapon to fire. With "*no cover*" and "*nowhere to hide*" from these perceived threats, *id.* at 92 (emphases added), Turner's fear of death or bodily harm at the time was reasonable, thus justifying his actions.[2] *Cf. Stewart v. State*, 167 N.E.3d 367,

---

[1] As the Court points out, "a person is justified in using force to defend against someone pointing an unloaded gun if the person in fear reasonably believes the gun is loaded." *Ante*, at 11. Under the standard applied by the trial court, by contrast, no person could successfully claim self-defense if they couldn't definitively say whether the assailant's pointed gun was loaded. *Cf. Hall v. State*, 166 N.E.3d 406, 414 (Ind. Ct. App. 2021) (rejecting a self-defense claim where the victim possessed a gun but made no "threatening gestures toward anyone" and had earlier "proclaimed more than once that she did not have any bullets").

[2] The attached exhibit, an overhead picture of the cul-de-sac layout in which the events unfolded, illustrates Turner's predicament.

377 (Ind. Ct. App. 2021) (holding that self-defense claim failed where the evidence "clear[ly]" showed that the defendant "was able to leave" her aggressors and "was no longer under physical threat when she retrieved her gun" before returning to shoot).

In short, given his repeated—and unwavering—testimony that he "just knew" it was Briscoe in the car, that he "believe[ed]" he was in harm's way, and that he "knew" he had to act to prevent that harm, Turner clearly met the subjective standard of our self-defense statute. Tr. Vol. 2, p. 91. And with the trial judge's admission that he may "have done the same thing" under the circumstances, *id.* at 127, Turner likewise met the statute's objective standard. Though there may be evidence to support the trial court's findings that Turner "couldn't see inside of this car" and "couldn't see a gun," *id.* at 126, the standard imposed by the court—one akin to requiring an irrebuttable knowledge of imminent harm—simply asks too much of a defendant to justify his actions.

# Conclusion

For the reasons above, I concur only in the Court's judgment.

